THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIAM PAUL, Defendant-Appellant.

Second District    No. 79-639

Opinion filed February 23, 1981.—Rehearing denied March 16, 1981.

Mary Robinson and Elizabeth Clarke, both of State Appellate Defender's Office, of Elgin, for appellant.

Dennis Schumacher, State's Attorney, of Oregon (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

This is an appeal from a denial of a motion to withdraw a guilty plea. The defendant and a co-defendant were charged and subsequently indicted on November 14, 1978, with two counts of murder and one count of concealment of homicidal death. The defendant's motion for suppression of statements made by him on August 1, 1978, was denied. The defendant entered a negotiated plea of guilty to the offense of murder as an accessory on January 26, 1979. The record shows the plea was entered in exchange for dismissal of the concealment charge, imposition of a 20-year determinate sentence for the accessory to murder charge, and recommendation by the court and the State's Attorney that the defendant "be sent to the Diagnostic Center in Joliet, Illinois for 60 days prior to sentencing with a view toward recommending a minimum facility within the Department of Corrections." This type of presentence procedure is permitted under section 5—3—3 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—3—3). The defendant was then 19 years old and his prior criminal history consisted of several minor traffic offenses, and one incident of possession of 1.7 grams of marijuana. At the time of his arrest for the instant offense he was on deferred prosecution for the possession offense.

The essence of the factual basis for the plea was that on May 22, 1978,

the defendant, co-defendant James Wilder, and the victim, Floyd Morrow, were at the Rochelle Conservation Club in Ogle County at which time Morrow was shot once by Wilder with a shotgun and died. The State's evidence would have shown the defendant did not pull the trigger but that the murder was premeditated by the defendant and Wilder. The record showed that a $500 tax refund check expected to be received by the victim was the possible motive for the murder. The record indicated defendant did not think Wilder was serious about killing Morrow, and that after Morrow had been shot, Wilder "turned" on the defendant and forced him to assist in Morrow's burial at the murder scene. The record reflects the defendant's statement that he and Wilder planned the murder when they were attending a rock concert in Wisconsin when they were high on drugs. The record also reflects the defendant stated he inscribed the name "Floyd" on a shotgun shell a week before the murder. The court accepted the guilty plea, noting that it and the State's Attorney would recommend a minimum security facility, unless the 60-day presentence evaluation at Joliet revealed need for another placement.

A presentence report was prepared by the Ogle County Probation Department and was filed on January 29, 1979, and the court entered its order sending the defendant to the Department of Corrections for 60 days. Three reports were received from the Adult Reception and Classification Services Unit at the Joliet Correctional Center and were filed on March 26, 1979. The first was prepared by psychiatrist C. T. Ciatteo; the second by casework supervisor David E. Steinberg; and the third by psychologist Robert A. Roe. Ciatteo's report reads in pertinent part:

> "No formal mental illness found. He does not classify as a Sexually Dangerous Person. He is not mentally deficient. He is not mentally ill and not in need of mental treatment. He does not appear criminally-oriented. His personality reveals a fairly well-integrated, adjusted young man, with no significant psychiatric deficit. He says that at the time he felt the whole incident was a joke and that the outing at the club ended tragically. He does express remorse for the victim's death.
>
> From a psychiatric standpoint, no recommendations are being offered. If incarcerated, he should get his GED and learn a trade. He has not been an institutional problem at this institution. Classification and placement will be performed when he is received at Joliet R & C. A protective type of institutional setting will be required for this young man and will so be recommended by the undersigned when received at R. & C."

Psychologist Roe's report reads in part:

> "If he is placed in a correctional institution he will probably need to be separated to some extent from residents who are large and

aggressive since he is young and relatively small physically. He tends to be rather personable but probably relates on a relatively superficial emotional level. He does not appear to be a basically criminally-oriented person."

Steinberg's report reads in pertinent part:

"Resident impresses as a nonaggressive, non-criminally-oriented individual whose values and attitudes appear near normative. He is still, however, somewhat impulsive and exercises poor judgment as demonstrated by involvement in the present offense. On an institutional level his adjustment should be adequate provided he is separated from larger and more aggressive residents. He should be given an opportunity to participate in a high school and GED program and eventually learn a vocational trade so he can support himself when released back into the free community. Counseling should focus on helping the process of socialization continue with this resident."

The sentencing hearing was held on August 16, 1979, at which time no evidence in aggravation or mitigation, save for the previously filed presentence report, was received. The judgment and sentence order entered the same day recites: "* * * The court hereby sentences said defendant to imprisonment in Joliet, Illinois Department of Correction [*sic*] and later to be at a minimum security and fixes the term of imprisonment at twenty years." According to a footnote in defendant's brief on appeal, the defendant is currently incarcerated in the Joliet Correctional Center, a maximum security facility.

■■ Prior to judgment and sentence, however, on April 4, 1979, defendant's counsel was allowed to withdraw and new private counsel was substituted at the defendant's request. Counsel prepared and filed on May 15, 1979, a motion to withdraw defendant's guilty plea. The motion was unverified, not signed by the defendant nor supported by affidavit. The attorney's certificate required by Supreme Court Rule 604(d) to be filed in conjunction with such a motion was not signed by counsel until July 11, 1980, and was filed as supplement to the record in this court on July 22, 1980. We note that the filing of the Rule 604(d) certificate is a "condition precedent" to a ruling on the merits of a motion to vacate. (*People v. Hummel* (1977), 48 Ill. App. 3d 1002.) However, when a Rule 604(d) certificate is filed in the reviewing court, the record on appeal is sufficient to permit review of the allegations of error, and where the purposes of the certificate have been fulfilled, the failure to file the certificate at the proper time is harmless error. (*People v. Evans* (1977), 46 Ill. App. 3d 689.) The insufficient form of the motion itself is moot, since the court held a hearing on it on June 29, 1979.

The motion to withdraw contained the following four allegations:

"1. That the Defendant, prior to the acceptance of the guilty plea in open court, signed a statement prepared by his attorneys, JERROLD R. BEGER and WILLIAM E. SCHIRGER, of the law firm of SCHIRMER, SCHIRGER, GRAFF & BEGER, LTD., agreeing with the counts of the plea bargain and concurring with the principal points of advice given him that lead to said plea bargain.

2. That said statement, signed by Defendant, shows *per se* that Defendant was not receiving effective legal representation.

3. That the Defendant's signature on said statement prior to acceptance of guilty plea in open court, constitutes coercion.

4. That the Court, on the 26th day of January, 1979, was or should have been aware of the said agreement signed by Defendant, or the agreement should have been brought to the attention of the Court by JERROLD R. BEGER, attorney for Defendant."

The "statement" referred to in the motion was admitted as defendant's Exhibit 1 during the plea withdrawal hearing on June 29, 1979. The statement was signed by the defendant and both of his parents within the hour preceding the defendant's formal entry of his guilty plea on January 26, 1979. In essence, the statement recited the defendant's acknowledgement that he had been advised of the following facts by his principal attorneys, Jerrold R. Beger and William E. Schirger: That the trial is set for January 30, and the attorneys are prepared to go to trial; that statements made by him had been unsuccessfully attempted to be suppressed; that an unsuccessful search of the counsels' law office pursuant to a warrant to discover an allegedly illegal tape recording of a conversation between Attorney Beger and Ogle County Sheriff Brooks did not result in any disturbance to his file nor to any privileged documents relating to his trial; that he concurs with his counsel that a motion challenging the case based on the attorney-client privilege as a result of the search would be unavailing since there were no witnesses available to testify to any actual viewing of the file by the police; that the results of a polygraph exam which he took and during which he indicated there was a plan to murder Morrow, and indicated certain facts about a shotgun shell, a shovel and a burying episode—which facts he had not previously told his lawyers—were inadmissible during trial, but that the court may permit the polygraph examiner to testify to his conversation before, during and after the exam; that with knowledge of the aforegoing facts, it is his decision to proceed with the plea bargain agreement "under the condition that I would plead guilty to the offense of murder as an accessory having a determinate sentence of 20-years [*sic*] with the further understanding that I would be sent upon the State's Attorney's and courts [*sic*] recommendation to a minimum security facility within the Depart-

ment of Correction [*sic*]"; and that he further understood that the polygraph exam results would not be part of his permanent record, and no evidence or aggravated facts and circumstances would be entered into evidence at the time of his sentencing hearing.

During the hearing to withdraw the plea of June 29, 1979, the defendant testified as follows:

"Q [Mr. Roe, defense counsel]: Did you ask Mr. Beger any questions about the statement before signing it?

A [Defendant]: I asked if I would be—If they didn't send me to a minimum security penitentiary, if I would be able to change my plea, and he said yes I would.

' Q: Now, what is your understanding of what a minimum security institution is, or what was it on that day?

A: It would be Sheridan Logan. It wouldn't be Stateville or Pontiac or a place like that.

Q: Do you understand that Mr. Beger is not in a position to tell you where the Department of Corrections might send you if the Judge sentenced you to a term in the penitentiary?

A: I didn't then, but I do now."

Defendant was also asked the following question:

"Q [Mr. Roe, defense counsel]: Any why did you plead guilty?

A [Defendant]: Because there [were] certain things said to me prior to the day that I plead guilty.

\* \* \*

A: Mr. Beger informed me that the only plea bargain the State would agree to would be 20 years and Mr. Schirger informed me that he talked to Judge Moore and Judge Moore said that if I was found guilty in trial at least he would consider giving me was 50 years."

On cross-examination, the following question was asked and answered:

"Q [Mr. Woods, State's Attorney]: Do you remember Mr. Beger stating to you that it was a possibility of you getting 20 years if you plead guilty?

A [Defendant]: He said that it would be a guaranteed 20 years."

When Attorney Beger was called to testify, defense counsel did not cross-examine him as to whether or not he had told the defendant he could withdraw his plea if he was not sent to a minimum security facility, nor was defendant's testimony on that point refuted on direct examination of Attorney Beger. Beger testified at the hearing that his proposed defense for the defendant was that Wilder acted unilaterally in killing Morrow. Defense counsel objected to questions by the State's Attorney wherein the State's Attorney attempted to show that Beger "was rudely awakened to a change of events" as the result of the defendant's polygraph responses

which would cause him to have to abandon the proposed theory of defense. The basis for defense counsel's objection was that:

"[Mr. Roe, Defense Counsel]: Nowhere in this motion says we questioned Mr. Beger's competence whatsoever, per sae [*sic*]. The motion says simple [*sic*] that this agreement was entered into prior to pleading guilty. What was made aware of to the Court was not understood by the defendant and therefore he was not effectively represented. That's what that motion says."

Shortly thereafter, the record shows the following colloquy:

"THE COURT: Well, all right. I'll say this. Based upon the counsel's representation in open Court that he is not attacking the competency of counsel, then I will limit the State's presentation to the question of statement was it made on the morning of or preceeding the plea of guilty.

MR. ROE: That's what it say [*sic*], your Honor.

THE COURT: Okay. So the competency of counsel is no longer in line.

MR. WOODS: Can we strike this Paragraph two, Judge?

MR. ROE: No, I am not striking it. If the Judge wants to make it on his own motion—

THE COURT: I won't strike it, but I am—

MR. ROE: That paragraph, your Honor, is meant to refer to that statement and I thought that that was clear.

THE COURT: All right.

MR. ROE: I apologize.

THE COURT: We will limit it just to the statement, then."

On direct examination, Beger stated he never heard former co-counsel Schirger tell the defendant the judge would give him 50 years if he did not plead guilty. They did, however, inform the defendant the court could impose an extended minimum term of 40 years if certain factors in aggravation were found to exist. Beger testified that he discussed with the defendant where he would be sent. Beger testified he had checked the statute which indicates the Department of Corrections has full authority where to place a person, and that they were going to ask a representation by the State's Attorney's Office and the court to concur in that the defendant would be sent to a minimum security facility in order to protect him from more aggressive and larger inmates. Beger indicated he followed up on this point and had correspondence with "Mr. Banley [phonetically] and the Department of Corrections and Mr. Doyle and he indicated that upon the proper recommendations it is possible that special arrangements can be made because of his—he has no prior offenses and because of his size. I think that was consistent with what his context of the plea bargain was."

Beger testified he did not recall bringing the fact of defendant's signed statement to the attention of the court at the time of the entry of the plea, and defense counsel withdrew his question to the court regarding its knowledge of the existence of the statement at that time after the court stated: "No answer." Defense counsel asked, and Beger responded, to the following question:

"Q [Mr. Roe, defense counsel]: Isn't it a fact that neither you individually nor the State's Attorney individually, nor the Court, nor a combination of the three of you can in fact determine where an individual is going to be sentenced as an accessory to murder?

\* \* \*

A [Mr. Beger]: As to whether I can determine where he is sent within the Department of Corrections, I can to the extent that I would with reasonable recommendations, he would be segregated from the general prison population, and as I have explained to you before, it was Billy's concern that he would not be concerned with larger, more aggressive inmates. As to that extent I think it is consistent from the plea-bargain agreement, from the presentence report that he is not going to be placed in with the general prison population."

Beger further testified that at the time the defendant signed the statement "he [defendant] was concerned for his physical safety in that we have had representations made in the presentence report by a psychiatrist, a psychologist and his case worker that he will be sent to what I believe to be a minimum security facility within the Department of Corrections with other youthful offenders; that he will not be mixed in with the general prison population and that was the entirety of this agreement because it was for Billy's physical safety that we asked the Court and Mr. Woods to concur with this recommendation and I believe they will, if in fact the Court proceeds with the sentencing."

The court reserved ruling on the motion until July 5, 1979, at which time it was in receipt of a handwritten letter from the defendant reiterating in essence that Beger told him he could withdraw his plea if not sent to a minimum security penitentiary, that he would lose if he went to trial, that Attorney Schirger told him the least the judge would give him was 50 years, and that the "counsler [sic]" in Joliet told him it was impossible for him to be sent to a minimum security penitentiary. After considering the results of the hearing, the defendant's letter, and the cases on misapprehension of fact or law when entering a guilty plea, the court orally denied the motion to withdraw. The formal written order denying the motion to withdraw was not signed until August 16, 1979, after the judgment and sentence order was signed on that same date.

Defendant presents two issues for review: (1) whether the assurance

made to the defendant by his counsel that he would be placed in a minimum security institution if he pleaded guilty and that he could withdraw his plea if he was not so placed, combined with the failure of the court to advise him such placement was discretionary with the Department of Corrections, rendered his plea involuntary and (2) alternatively, whether the defendant received ineffective assistance of counsel since he was misadvised concerning some of the ramifications of his plea of guilty.

■■■ At the outset, we consider whether the court's denial of the motion to withdraw the plea has been properly perfected for appeal, although neither party has raised the issue. It has been held that a motion to withdraw a guilty plea filed prior to sentencing (which is the case here) is insufficient for purposes of Rule 604(d) to perfect an issue for appeal. (*People v. Hale* (1979), 77 Ill. App. 3d 721.) In *Hale*, the court considered whether a motion to withdraw a plea of guilty could be filed and heard prior to sentencing. The court found that it could, but that an appeal could not be taken from a denial thereof until after sentencing and the filing of another motion to withdraw a plea. (*Hale*, at 721-22.) We question, however, the wisdom of this strict construction and application of Rule 604(d) as advanced in *Hale*, since we believe it would result often in a great degree of unnecessary repetition. That aside, we find significant distinguishing features in the case at bar, however, and hold the issue was properly perfected for appeal. In the case at hand, the actual denial of the motion to withdraw the guilty plea was not signed by the judge until after sentence had been imposed; such denial, although orally announced on July 5, was not effective until entered "of record." (Ill. Rev. Stat. 1979, ch. 110A, par. 272.) Further, in admonishing the defendant pursuant to Supreme Court Rule 605(b) (Ill. Rev. Stat. 1979, ch. 110A, par. 605(b)), the report of proceedings shows the court noted the defendant's motion to have the plea vacated had already been filed, "so that's taken care of." Consequently, we do not feel it would be fair to refuse to consider the appeal on the precedent of *Hale* due to the defendant's failure to file a second motion, which we feel would have been wholly redundant and unnecessary under the facts of this case.

■■ Our review here is concerned only with defendant's contention as to the voluntariness of his plea. It is our opinion that the defendant waived our consideration of the effective assistance of counsel issue at the time of the hearing on the motion to withdraw the guilty plea. Defendant's counsel on the motion to withdraw specifically told the trial court that the competency of counsel who negotiated the plea was not being questioned, and the court disregarded this issue in ruling on the defendant's motion to withdraw. Ill. Rev. Stat. 1979, ch. 110A, par. 604(d); *People v. Tompkins* (1974), 24 Ill. App. 3d 470.

In order to show ineffective assistance of counsel, the record would

have to reflect that Attorney Beger's representation of the defendant reduced the proceedings to a farce or sham (*People v. Murphy* (1978), 72 Ill. 2d 421), and that this amounted to plain error affecting a substantial right. (Ill. Rev. Stat. 1979, ch. 110A, par. 615(a).) We do not believe the record shows the existence of such plain error, and we determine the issue has been waived on appeal.

Concerning whether the representations made to the defendant about where he would be sentenced rendered his plea involuntary, we first consider exactly what it was that was being "bargained for." The record reflects that the defendant was concerned about his safety, and that he desired protection from larger, more aggressive inmates. He believed such protection would be afforded if he were placed in a "minimum security facility," which he testified he believed was a facility such as Sheridan or Logan, not Pontiac or Joliet. He believed that upon recommendation by the State's Attorney and the court he would be sent to such a minimum security facility, and that if he were not so placed he could withdraw his plea.

■■■ Defendant correctly states that the decision whether or not to allow a defendant to withdraw a guilty plea is within the discretion of the trial court, and that generally such a motion is allowed if it appears the plea resulted from misapprehension of law or fact or in consequence of misrepresentation by counsel, State's Attorney or someone else in authority. (*People v. Ryan* (1979), 74 Ill. App. 3d 886.) In addition, a motion to withdraw may be allowed where the defendant has a defense worthy of consideration, or where there is doubt of the guilt of the accused and the ends of justice would better be served by submitting the case to trial. (*People v. Martin* (1978), 58 Ill. App. 3d 633.) It is asserted that the defendant was under the misapprehension that the State's Attorney and the court had control over the defendant's placement once he was sentenced, and that he could withdraw his plea if he was not sentenced to a minimum security facility. Of course, neither the court nor counsel can determine the placement of an inmate in the State's penitentiary system. The Unified Code of Corrections requires that a defendant convicted of murder shall be sentenced to a term of not less than 20 years. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1.) The offender is then committed to the custody of the Department of Corrections. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—5.) The statute further provides that offenders sentenced to imprisonment may be assigned by the Department of Corrections to any of its institutions, facilities or programs. Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—6.

As the supreme court has pointed out:

"The Unified Code of Corrections does not provide for sentences of confinement to a penitentiary, but rather prescribes that a

court may impose a sentence of commitment to the Department of Corrections. After the imposition of such a sentence, it remains primarily within the purview of the Department of Corrections to execute the sentence in accordance with the laws enacted by the legislature regarding the management, care and rehabilitation of persons committed to the Department." *People v. Williams* (1977), 66 Ill. 2d 179, 187.

Defendant's counsel requested leave of court to change the defendant's plea from not guilty to guilty of the offense of murder and he stated in open court as follows:

"* * * [T]he plea negotiation would be in exchange for a twenty (20) year determinate sentence which I can understand is the minimum under the 1978 Criminal Code and the Concealment offense[1] would be dismissed and that the State's Attorney, as well as the court, would recommend that he be sent to the Diognostic [sic] Center in Joliet, Illinois for 60 days prior to sentencing with a view towards recommending a minimum facility within the Department of Corrections."

---

[1] Ill. Rev. Stat. 1979, ch. 38, par. 9—3.1 (Concealment of Homicidal Death).

The trial judge questioned the defendant as to whether he understood that and the defendant replied that he did.

The trial judge gave the defendant the other usual admonitions prior to receiving a plea of guilty and further admonished the defendant that:

"* * * if you do plead guilty you could be sentenced to a minimum of twenty (20) years up to a maximum of your natural life, do you understand that?"

The defendant replied that he did. The trial judge then went on:

"THE COURT: You also could be sentenced to the ultimate punishment in Illinois which is death by electrocution, do you understand that?

DEFENDANT: Yes Sir."

The defendant persisted in his plea of guilty. The trial judge then committed the defendant to the Department of Corrections for study pursuant to section 5—3—3 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—3—3) which permits such a procedure where the court is of the opinion that imprisonment may be appropriate but desires more information as a basis for determining the sentence than has been or may otherwise be provided.

At that time defense counsel requested the court to recommend a minimum security facility. The trial judge responded:

"THE COURT: Based upon, if there is not something that comes back from the Department after the evaluation."

The reports received from the Diagnostic Center were consistent with the view that the defendant was not an aggressive, criminally oriented person but rather one who should be protected from more violent and aggressive inmates in the prison population. After receipt of these reports the trial judge and the State's Attorney both complied with the plea agreement in that they did recommend to the Department of Corrections that the defendant be placed in a minimum security facility.

Such recommendations and information regarding the defendant, his background, the facts and circumstances of his offense and other matters which may aid the Department during its custody of the offender may be supplied by court or counsel to the Department pursuant to section 5—4—1 of the Unified Code of Corrections. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1.) The actions of the trial court and State's Attorney are therefore permitted by this statutory provision.

■■ It is, however, defendant's contention that the fact that the Department of Corrections is not mandated to place the defendant in a minimum security facility makes his plea of guilty involuntary since it was based on inaccurate advice from his former counsel. When counsel was called as a witness, he was not asked whether he had so advised the defendant; rather, he testified that he believed his recommendations, that of the court and the State's Attorney would result in such a placement. This may have been an error in judgment by defense counsel. However, that error was not induced by the State or by the court and the defendant is not entitled to relief. *People v. Ryan* (1979), 74 Ill. App. 3d 886; *People v. Lambrechts* (1977), 69 Ill. 2d 544.

There was no indication that the defendant had any defense worthy of consideration that could have been presented to a jury upon trial of the cause. Defendant's motion to suppress his statements and admissions regarding his involvement in the murder had been denied previously, and he claimed no error in that denial. As such, the trial court did not abuse its discretion in denying the defendant's motion to withdraw.

Finally, we wish to note that this court has not been presented with any evidence that the defendant did not, in fact, receive the "benefit of the bargain" he struck. The State's Attorney and the court clearly made the recommendation of "minimum security" as they agreed to do.

We affirm the judgment of the circuit court of Ogle County.

Judgment affirmed.

SEIDENFELD, P. J., and REINHARD, J., concur.